**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 11 |
| SPORTS AUTHORITY HOLDINGS, INC., *et al.*,[1] | Case No. 16-10527 (MFW) |
| Debtors. | (Jointly Administered) |
| WILMINGTON SAVINGS FUND SOCIETY, FSB, AS SUCCESSOR ADMINISTRATIVE AND COLLATERAL AGENT, | |
| Appellant, | C.A. No. _____ |
| v. | |
| SPORTS AUTHORITY HOLDINGS, INC., *et al.*, | **FILED UNDER SEAL** |
| Appellees. | |

**EMERGENCY MOTION BY WILMINGTON SAVINGS FUND**
**SOCIETY, FSB, AS TERM LOAN AGENT FOR A STAY PENDING APPEAL**
**OF ORDER RESOLVING DEBTORS' ABILITY TO SELL CONSIGNED GOODS**

Wilmington Savings Fund Society, FSB, as successor administrative and collateral agent

(the "Term Loan Agent") under that certain Amended and Restated Credit Agreement, dated as

of November 16, 2010 (the "Term Loan Credit Agreement"), by and among The Sports

Authority, Inc., as the Borrower, Slap Shot Holdings Corp., as Holdings, Wilmington Savings

Fund Society, FSB, as successor Administrative Agent and Collateral Agent to Bank of America,

N.A, and the lenders from time to time party thereto (the "Term Loan Lenders"), hereby files this

Emergency Motion (the "Stay Motion") for a Stay Pending Appeal (the "Stay") of the

*Supplemental Interim Order Authorizing the Debtors to Continue To Sell Certain Prepetition*

---

[1]     The Debtors and the last four digits of their respective taxpayer identification numbers are as follows:  Sports Authority Holdings, Inc. (9008); Slap Shot Holdings, Corp. (8209); The Sports Authority, Inc. (2802); TSA Stores, Inc. (1120); TSA Gift Card, Inc. (1918); TSA Ponce, Inc. (4817); and TSA Caribe, Inc. (5664).  The headquarters for the above-captioned Debtors is located at 1050 West Hampden Avenue, Englewood, Colorado 80110.

*Consigned Goods* [D.I. 1044] (the "<u>Order</u>") entered on April 5, 2016[2] in the Chapter 11 Cases of

Sports Authority Holdings, Inc.; Slap Shot Holdings, Corp.; The Sports Authority, Inc.; TSA

Stores, Inc.; TSA Gift Card, Inc.; TSA Ponce, Inc.; and TSA Caribe, Inc. (the "<u>Debtors</u>").

## PRELIMINARY STATEMENT

1.      The Term Loan Agent seeks an emergency stay of the Order entered in the

chapter 11 cases of the Debtors permitting the use and disbursement of the Term Loan Agent's

collateral without adequate protection.   The Order permits the diminution of the value of

collateral serving as security for the repayment of the approximately $276 million owed to the

Term Loan Lenders.   The Order permits collateral to be sold and the cash proceeds of sales to be

paid to consignment vendors who, almost without exception, have not perfected their interests in

the Debtors' inventory.   The Term Loan Agent, as agent for the Term Loan Lenders, holds

perfected liens in both the goods authorized to be sold under the Order and the proceeds of those

goods.   Using the Debtors' own projections, the estimated amount that will be disbursed to

consignment vendors pursuant to the Order is approximately $85 million over time.

2.      As of April 7, 2016, payments made pursuant to a ruling on March 11, 2016 and

memorialized by the Order have already resulted in diminution of the Term Loan Lenders'

interest in collateral by an amount roughly commensurate with such payments, namely $1.5

million.   As of March 30, 2016, the Debtors held in escrow approximately $7.5 million in

proceeds from the sale of Prepetition Consigned Goods.   Based on projected payment schedules

---

[2]      The April 5, 2016 Order resolves the *Debtors' Motion for Interim and Final Orders (A) Authorizing the Debtors to (I) Continue to Sell Consigned Goods in the Ordinary Course of Business Free and Clear of All Liens, Claims and Encumbrances and (II) Grant Administrative Expense Priority to Consignment Vendors for Consigned Goods Delivered Postpetition; and (B) Grant Replacement Liens to Consignment Vendors with Perfected Security Interests in Consigned Goods and/or Remit the Consignment Sale Price Arising from Sale of Consigned Goods to Putative Consignment Vendors*, dated Mar. 2, 2016 [D.I. 9] (the "<u>Consigned Goods Motion</u>").

provided by the Debtors, substantially all amounts escrowed will be paid out to Consignment Vendors on or before May 15, 2016.

3.      Section 363(p) of the Bankruptcy Code imposes on the Debtors the burden of proof on adequate protection.  Notwithstanding, no evidence of adequate protection was proffered by the Debtors in support of their ability to compensate the Term Loan Agent for the payments permitted pursuant to the Order.  Indeed, the Debtors have consistently argued that the Term Loan Agent, and *not* the consignment vendors, is senior in its right to be paid all or substantially all of this $85 million in disputed proceeds.  The Term Loan Agent also proffered testimony and documentary evidence that amounts remitted post-petition to fund the Debtors' continuing losses from operations had already reduced and will continue to reduce collateral available for satisfaction of the claim of the Term Loan Lenders.  By entering the Order without requiring the Debtors to provide the Term Loan Agent with adequate protection of its senior interests, the Bankruptcy Court committed reversible error.

4.      At the hearing at which the Order was issued, the Term Loan Lenders asked for a stay of the Order pending appeal.  This stay motion was denied.

5.      The Order was issued as a final, appealable order of the Bankruptcy Court.  See Apr. 5, 2016 Hr'g Tr. 32:19-21.

6.      A Notice of Appeal has been filed.  Unless stayed pending that appeal, the Order will result in irreparable harm to the Term Loan Lenders.  The proceeds of the sale of the Debtors' inventory are the sole source from which to replace the collateral value from sales of consigned goods.  These Debtors simply do not have sufficient unencumbered assets to compensate for the cash now authorized to be paid to consignment vendors.  Although the Order nominally preserves the rights of the Term Loan Agent in the form of the right to sue the 160 or

so recipients of that cash, the possibility of such recoveries falls far short of adequate protection. Without a stay pending appeal of the Order, the Term Loan Agent will suffer irreparable harm.

7.      In contrast, there is no evidence that a stay would impose hardship on other parties in interest.  Pending appeal, the proceeds from sales of goods supplied by them can be escrowed, as proposed by the Debtors and Term Loan Agent to the Bankruptcy Court below.

## JURISDICTION

8.      The Court has jurisdiction to hear this matter pursuant to 28 U.S.C. § 158(a).[3]

9.      The Court may grant the relief requested herein pursuant to Federal Rule of Bankruptcy Procedure 8007.

## RULE 7007.1 CORPORATE DISCLOSURE STATEMENT

10.      Wilmington Savings Fund Society, FSB, solely in its capacity as the Term Loan Agent, is a wholly owned subsidiary of WSFS Financial Corp., a publicly held corporation.

## RELEVANT FACTUAL AND PROCEDURAL BACKGROUND

### I.      The Debtors' Secured Debt Obligations to the Term Loan Lenders.

11.      The Debtors market and sell sporting goods and active apparel to the general public from approximately 464 retail stores located across 40 U.S. states and Puerto Rico.  In 2006, the Debtors entered into a Term Loan Credit Agreement pursuant to which they borrowed

---

[3]      The Order, which was entered without adequate protection, is a final, appealable order.  See Hartman v. Wells Fargo Bank, N.A. (In re Hartman), Civ. A. Nos. 15-4437 (ES), 15-5060 (ES), 2016 WL 1183175, at *7 (D.N.J. 2016) ("[A] bankruptcy court's order concerning adequate protection is reviewable by a district court."); Wilmington Tr. Co. v. AMR Corp. (In re AMR Corp.), 490 B.R. 470, 475-76 (S.D.N.Y. 2013) (finding order denying motion for adequate protection final and appealable); cf. Buncher Co. v. Official Comm. of Unsecured Creditors of GenFarm Ltd. P'ship IV, 229 F.3d 245, 250 (3d Cir. 2000) (explaining that courts in the Third Circuit apply "a relaxed standard of finality in bankruptcy cases" and consider a number of factors, including, most importantly, the impact on the assets of the bankruptcy estate).  Alternatively, even assuming the Order is not final, under 28 U.S.C. § 158(a)(3), this Court can and should exercise its discretion to hear this appeal and grant this Stay Motion.  The very same grounds set forth in support of the relief requested herein, in particular the imminent irreparable harm to the Term Loan Agent and the Term Loan Lenders, establish the need for immediate review by this Court.

$300 million of which approximately $276.7 in principle remains outstanding.[4]  As amended and restated, the Term Loan Credit Agreement matures on November 16, 2017.

12.     Pursuant to the Term Loan Security Agreement,[5] the Term Loan Agent holds a lien and security interest in the "Collateral," which includes "all personal property of each Grantor,[6] including, without limitation, all . . . Inventory . . . whether now owned . . . or hereafter acquired . . . ."  Term Loan Security Agreement § 1.02.[7]  "Inventory" is defined to include "the meaning given that term under the UCC . . . ."  Id.  Under the UCC, "Inventory" is defined to include "goods . . . which . . . are held by a person for sale . . . ."  UCC § 9-102(48).  Accordingly, "Inventory" unambiguously includes goods consigned to the Debtors for sale.

13.     In addition to its interest in Collateral, the Term Loan Agent has a perfected security interest in "Proceeds," defined by reference to the UCC to include "whatever is acquired upon the sale . . . or other disposition of collateral."  UCC § 9-102(64)

14.     Pursuant to the Term Loan Security Agreement, the Debtors represented and warranted that no Grantor Debtors possessed any property on consignment, except for inventory on consignment representing an immaterial portion of total inventory.  The Grantor Debtors also covenanted that they would not, in the future, acquire material amounts of inventory on

---

[4]     See Declaration of Jeremy Aguilar in Support of the Debtors' Chapter 11 Petitions and Requests for First Day Relief (the "Aguilar Decl.") [D.I. 22].  Capitalized terms used herein but not otherwise defined have the meanings ascribed to terms in the Aguilar Declaration. An excerpt of the Term Loan Credit Agreement is attached to the Declaration of May Orenstein (the "Decl.") as Exhibit A.

[5]     "Term Loan Security Agreement" means the Security Agreement, dated as of May 3, 2006, by and among (a) The Sports Authority, Inc., as borrower, (b) each of the guarantors listed on Schedule I thereto, and (c) Wilmington Savings Fund Society, FSB, as successor collateral agent to Bank of America, N.A., Decl. Ex. A.

[6]     The Grantors under are: (a) The Sports Authority, Inc.; (b) Slap Shot Holdings Corp.; (c) TSA Stores, Inc.; and (d) TSA Gift Card, Inc. (collectively, the "Grantor Debtors").  See Term Loan Security Agreement, at 1, Schedule 1.

[7]     Pursuant to an Intercreditor Agreement, the lien securing the Term Loan Lenders' $276.7 million in outstanding principle loan to the Debtors is junior to other secured debt (including an asset-based lending facility for which the Debtors' liabilities amount to $339.17 million) with respect to certain collateral, including inventory.  See Declaration of James H. Baird in Support of Term Loan Agent's Reply (I) in Support of Debtors' Consigned Goods Motion and Other First Day Relief, and (II) to Vendors' Objections to Same ¶¶ 9-10, 48 (the "Baird Decl."), Decl. Ex. H.

consignment.  Term Loan Security Agreement § 3.06; Schedule 3.06 ("Except [for an immaterial portion of total inventory], no Grantor has, *and none shall have*, possession of any property on consignment.") (emphasis added).[8]

15.     This covenant against receiving property on consignment was directed to protect the priority of the liens granted to the Term Loan Agent.  Without this prohibition, consigning vendors (if they took the steps legally necessary to perfect their interests in the consigned goods) could have potentially achieved priority over those secured lenders with a "floating lien."

16.     After making this representation, the Debtors repeatedly certified to the Term Loan Agent (most recently as of October 31, 2015) that they were in compliance with each covenant and condition under the Term Loan Documents, including the "no consignment" representation and covenant of the Term Loan Security Agreement.[9]

17.     In actuality, the Debtors were in material breach of the consignment related contractual provision found in the Term Loan Security Agreement and the Debtors' certifications were false when made.  This is no small covenant breach.  Based on the value of inventory set forth by the Debtors, as of the Petition Date, consigned goods comprised approximately 11.3% to 12.7% of the Debtors' aggregate inventory having an approximate value (at cost to the Debtors) of $85 million.[10]

18.     The failure of the Debtors to comply with this covenant of the Term Loan Security Agreement was a default under the Term Loan Credit Agreement entitling the Term

---

[8]     In the offering materials distributed prior to entry into the Term Loan Credit Agreement, the Debtors marketed the Term Loan as having "significant collateral coverage," a material portion of which was its inventory, which the Debtors stated "would likely perform favorably in a going-out-of business sale."   Sports Authority Confidential Information Memorandum, $300,000,000 Senior Secured Term Loan Facility, dated October 2010, at 20, Decl. Ex. C.  The Debtors further touted their large volume of inventory purchases and strong buying power with key vendors. See id. at 24.

[9]     See Decl. Exs. D, E, F and G.

[10]    See Aguilar Decl. ¶ 26 (indicating that the value of the Prepetition Consigned Goods as of the Petition Date was approximately $84.8 million); ¶ 31 (indicating that the value of total inventory (which may or may not include consigned goods) as of the Petition Date was approximately $665.9 million).

Loan Agent to exercise applicable rights and remedies.  See Term Loan Credit Agreement § 8.01(c).

## II.      The Debtors' Consignment Arrangements with Vendors.

19.      As of the Petition Date, the Debtors, in violation of their obligations to the Term Loan Lenders, had approximately 8.5 million units of goods on consignment (the "Prepetition Consigned Goods") from approximately 170 vendors (the "Consignment Vendors"), with a value of approximately $85 million.  See Aguilar Decl. ¶ 97.  These Prepetition Consigned Goods were shipped and delivered to the Debtors for resale prior to the Petition Date pursuant to short-form agreements ("Consignment Agreements") that incorporated the terms of a "Vendor Relationship Guide" (the "VRG").  Pursuant to the VRG, a vendor can elect to supply goods to Debtor TSA Stores, Inc. ("TSA") as a consignor pursuant to "pay by scan" arrangements.

20.      The Consignment Agreements identify the arrangement between the Consignment Vendors and Debtor TSA as "a consignment as defined in Section 9-102 [of the UCC]."[11]  The Agreements provide for "title" to remain with the Consignment Vendor until sale to the retail customer.  The Consignment Agreements authorize the Consignment Vendors to file UCC-1 Financing Statements to "reflect this consignment."[12]

21.      The Consignment Agreements entitle Consignment Vendors to either a percentage of the retail proceeds of consigned goods or an agreed-upon invoice price (the "Consignment Sale Price").  See Consignment Goods Motion ¶ 7.  Payment is due on specified terms.  Any proceeds from the sale of consigned goods that exceed the Consignment Sale Price

---

[11]     The Agreements specify the versions of the UCC in effect is Colorado and Delaware.  A copy of each Agreement is attached to each of the respective approximately 160 adversary proceedings filed by the Debtors in these Chapter 11 Cases.

[12]     Notwithstanding this apparent contractual authority to file financing statements, the Debtors have stated that only 3 of the 160 vendors may have perfected their liens, and only as to a portion of the goods delivered.  See Apr. 5, 2016 Hr'g Tr. 20:20-21:1.  If any vendor is determined to have a perfected senior position in goods, the Term Loan Agent has no objection to the full payment to those vendors of proceeds on account of those perfected interests.

constitute the Debtors' gross profits.  During fiscal year 2015, the Debtors sold approximately $244 million in consigned goods, realizing approximately $128 million in gross profits.  <u>See</u> Aguilar Decl. ¶ 98.

## III.    <u>The Chapter 11 Proceedings</u>.

22.    On March 2, 2016 (the "<u>Petition Date</u>"), the Debtors commenced their chapter 11 cases.  Among motions seeking so-called "first day relief," the Debtors sought interim and final orders authorizing them to continue selling Prepetition Consigned Goods.  <u>See</u> Consigned Goods Motion.

23.    The Debtors' Consigned Goods Motion addressed preemptively the potential dispute between Consignment Vendors and the Term Loan Agent by proposing to escrow the proceeds of consigned goods until the court had the opportunity to decide which parties were legally entitled to that $85 million in cash.  This resolution would have, had it been implemented, provided protection to the interests of both Consignment Vendors and the Term Loan Agent pending resolution of the rights of such parties.

24.    At the Debtors' first day hearing on March 3, 2016, a number of Consignment Vendors objected to the relief requested in the Consigned Goods Motion.  The Consignment Vendors argued, <i>inter alia</i>, that the Prepetition Consigned Goods were not property of the Debtors' estates for purposes of sales pursuant to Section 363 and that the Consignment Vendors should be permitted to take possession of the Prepetition Consigned Goods previously delivered to the Debtors.  <u>See</u> Mar. 3, 2016 Hr'g Tr. 38:10-39:23.

25.    The Court permitted the Debtors to continue selling the Prepetition Consigned Goods on an interim basis while placing the Consignment Sale Price in escrow.  The Court indicated that, to the extent there was a dispute over ownership of the Prepetition Consigned

Goods and/or the Consignment Sale Price, the Debtors were to initiate an adversary proceeding seeking a declaratory judgment.  See id. 110:9-111:25.  The Court suggested that initiating the adversary proceedings would create a bona fide dispute with respect to the Prepetition Consigned Goods and/or the Consignment Sale Price.  See id. at 102:1-2; 110:9-111:25.

IV.     **The Interim Consigned Goods Order.**

26.     On March 10, 2016, two proposed orders were submitted for approval, one by the Debtors [D.I. 259], and one by the Consignment Vendors [D.I. 265].  Under the Consignment Vendors' proposed Order, Consignment Vendors were able to prohibit, by the giving of notice, the Debtors' sale of Prepetition Consigned Goods delivered by the Vendor prior to the Petition Date. [D.I. 265, Ex. C, ¶¶ 4, 6].  On March 11, 2016, the Bankruptcy Court entered the Consignment Vendors' form of proposed order (the "Interim Order").[13]

27.     The Debtors sought reconsideration of the Interim Order.  The Bankruptcy Court held an emergency teleconference between the Debtors and certain Consignment Vendors to address the provision conferring the right on Consigned Vendors to require the Debtors to cease sales of Prepetition Consigned Goods.  The Term Loan Agent was neither provided notice of, nor present for, this teleconference.  The Court subsequently issued an order deleting the provision of the Interim Order at issue (the "Reconsideration Order").  The Reconsideration Order provided for a March 16, 2016 hearing to reconsider procedures upon notice from a Consignment Vendor to cease selling Prepetition Consigned Goods.[14]

---

[13]    *Interim Order (A) Authorizing the Debtors to (I) Continue to Sell Consigned Goods in the Ordinary Course of Business Free and Clear of All Liens, Claims, Encumbrances, and Interests; and (II) Grant Administrative Expense Priority and Purchase Money Security Interests to Consignment Vendors for Consigned Goods Delivered Postpetition; and (B) Grant Replacement Liens to Consignment Vendors with Security Interests and/or Holding Title or Ownership Rights in Consigned Goods and/or Remit the Consignment Sale Price Arising from Sale of Consigned Goods to Putative Consignment Vendors*, dated Mar. 11, 2016 [D.I. 278].

[14]    See *Order*, dated Mar. 11, 2016 [D.I. 289].

V.     **Commencement Of The Adversary Proceedings.**

28.     On March 15 and 16, 2016, the Debtors filed approximately 160 adversary proceeding (the "Adversary Proceedings") against substantially all of the Consignment Vendors alleging, *inter alia*, that the Debtors, as hypothetical lien creditors, held a superior interest in the Prepetition Consigned Goods over the Consignment Vendors.[15]  By commencing the Adversary Proceedings, the Debtors formalized the bona fide dispute regarding ownership of the Prepetition Consigned Goods and the respective rights to the proceeds of those Goods as among their creditors.  See Mar. 16, 2016 Hr'g Tr. at 11:5-11.

VI.    **March 16, 2016 Hearing On The Reconsideration Order.**

29.     On March 16, 2016, at the hearing on the Reconsideration Order, the Debtors informed the Court that they had already received nearly a dozen notices to stop selling Prepetition Consigned Goods.  See Mar. 16, 2016 Hr'g Tr. at 12:9-13.  Complying with those requests would involve a "massive effort" – likely taking months to complete – that would render the undertaking impractical and expensive.  Id. at 21:6-22:23.

30.     The Court informed the Debtors that they had three options: (i) stop selling and return the Prepetition Consigned Goods; (ii) reach a settlement with the Consignment Vendors; or (iii) comply with the terms of the Consignment Agreements as in effect prepetition, which would mean paying Consignment Vendors the Consignment Sale Price in accordance with the payment terms in the Agreements.  See id. 44:3-13; 52:15-17.

31.     Faced with these alternatives, the Debtors elected compliance with the terms of the pre-petition Consignment Agreements.  See id. at 46:15-21.  The Court instructed the

---

[15]    The Term Loan Agent has moved to intervene in each of the Adversary Proceedings.  As of the filing of this Memorandum, that motion remains pending before the Bankruptcy Court.

Debtors, Secured Lenders, and Consignment Vendors to draft a form of Order that would memorialize the Court's decision.  However, the parties were unable to reach consensus.

## VII.   Asics' Omnibus Objection And The Consignment Vendors' Joinders And Term Loan Agent's Reply To Same.

32.    On March 22, 2016, Asics America Corporation ("Asics"), a participant in the Debtors' consignment program, filed an omnibus objection (the "Omnibus Objection") to the Debtors' Consigned Goods Motion, Store Closing Motion, and DIP Financing Motion.[16]  Asics argued, in reliance on its Consignment Agreement, that the Debtors were not entitled to relief under Section 363 because, among other reasons, "the Debtors have no interest in [property supplied by Asics to the Debtors]."  See Omnibus Objection ¶ 46.  Certain Consignment Vendors joined in the Omnibus Objection.  The aggregate value of Prepetition Consigned Goods in dispute for Asics and the Consignment Vendors who filed joinders is approximately $66 million.

33.    The Term Loan Agent filed a Reply to (A) Vendors' Objections and (B) Debtors' Consigned Goods Motion (the "Reply").[17]  The Term Loan Agent objected to a resolution that allowed for the proceeds of Collateral to be remitted to Consignment Vendors without providing for adequate protection of the Term Loan Agent's interest in the Collateral.  See Reply Point II.

34.    The Term Loan Agent's Reply was supported by a declaration of the Term Loan Agent's financial advisor, Mr. James Baird of PJT Partners, that showed, in reliance upon the Debtors' Liquidity Forecast, that the Term Loan Agent's interests in the Collateral would decline from approximately $110 million as of March 5, 2016 to approximately $11.8 million as of July

---

[16]    See Omnibus Objection of ASICS America Corporation to Debtors' Motions for Entry of Final Orders on the (1) Consignment Motion; (2) GOB Motion and (3) DIP Motion, dated Mar. 22, 2016 [D.I. 644].

[17]    See Term Loan Agent's Reply (I) in Support of Debtors' Consigned Goods Motion and Other First Day Relief, and (II) to Vendors' Objections to Same, dated Mar. 31, 2016 [D.I. 932].

2, 2016 due to operating losses.  See Baird Decl. ¶¶ 60-62.  Payments to Consignment Vendors will further contribute to this decline in the value of the Term Loan Agent's Collateral.

35.      The Term Loan Agent requested that the Court enter the Debtors' original proposed final order to the Consigned Goods Motion or, in the alternative, deny the Consigned Goods Motion entirely.  See Reply ¶ 7.

**VIII.   The April 5, 2016 Hearing And Order.**

36.      On April 5, 2016, the Bankruptcy Court held a final hearing on the Consigned Goods Motion.  The Term Loan Agent appeared at the final hearing and demanded adequate protection of its interest in the Debtors' Collateral and proffered evidence (the testimony of Mr. Baird, consistent with his Declaration) in support of this relief.  See Apr. 5, 2016 Hr'g Tr. 26:14-22 ("[W]e are suffering a fifty-million-dollar diminution by the debtors' projections. . . . We're trying to work with the company. . . .  But we can't stand by and allow a complete lack of adequate protection to our position.").  The Bankruptcy Court refused the proffer and entered the Order.  The Term Loan Agent then made a motion before the bankruptcy court for a stay of the Order pending appeal.  That motion was denied and an order denying the motion was entered. See id. at 33:23-24; D.I. 1045.

37.      The Order authorizes the Debtors to sell the Prepetition Consigned Goods in the ordinary course and to remit the Consignment Sale Price in accordance with the terms of the Consignment Agreements.

38.      The Term Loan Agent's right to adequate protection of its interest in the Collateral and the basis upon which the Bankruptcy Court overruled the Term Loan Agent's request for adequate protection are not addressed in the Order.

39.     The Term Loan Agent believes the Bankruptcy Court's ruling is clearly erroneous for its failure to address and provide for adequate protection of the Term Loan Agent's interest in Collateral.  Accordingly, it filed a Notice of Appeal on April 7, 2016.  The Term Loan Agent has filed its Stay Motion because it believes that implementation of the Order, and particularly the disbursement of up to $85 million in cash in which the Term Loan Agent has a security interest senior to any interest of the parties to whom that cash would be otherwise disbursed, will continue to cause irreparable harm to the interests of the Term Loan Agent and Term Loan Lenders.[18]

## RELIEF REQUESTED

40.     By the Stay Motion, the Term Loan Agent seeks entry of an Order granting a stay pending appeal of that portion of the Order providing that the Debtors shall comply with the payment terms set forth in the applicable Agreements with the Consignment Vendors.  Order ¶ 3.

## ARGUMENT

**I.      The Standard for Granting a Stay Pending Appeal.**

41.     Bankruptcy Rule 8007 authorizes the Court to "stay the effect of a bankruptcy court order pending a resolution on appeal."  In re Revel AC, Inc., 802 F.3d 558, 568 (3d Cir. 2015).  Among others, one of the reasons for granting a stay is to "maintain the status quo." KOS Pharm., Inc. v. Andrix Corp., 369 F.3d 700, 708 (3d Cir. 2004).  In deciding a motion for a stay, a court will consider those same factors it looks to when ruling on an application for a preliminary injunction.  See Revel, 802 F.3d at 568.  Specifically, courts will weigh whether (1) the stay applicant has made a strong showing that it is likely to succeed on the merits; (2) the applicant will be irreparably injured absent a stay; and (3) issuance of the stay will substantially

---

[18]     All of the grounds upon which the Emergency Motion is based were presented to the Bankruptcy Court.

injure the other parties interested in the proceeding.  Id. (quoting Hilton v. Braunskill, 481 U.S. 770, 776 (1987)).  Additionally, the court will consider where the public interest lies.  See id.

42.     No single factor is dispositive.  See Haskell v. Goldman, Sachs & Co. (In re Genesis Health Ventures, Inc.), 367 B.R. 516, 519 (Bankr. D. Del. 2007) (finding all four factors weighed in favor of granting motion to stay proceedings pending appeal) (citation omitted); Meisel v. Armenia Coffee Corp. (In re Hudson's Coffee, Inc.), No. 06-1458, 2008 Bankr. LEXIS 2994, at * 4 (Bankr. D.N.J. Oct. 31, 2008) ("[N]o single factor is outcome determinative. Rather, [a court] must balance all of the elements in order to reach an appropriate determination."); see also In re Countrywide Home Loans, Inc., 387 B.R. 467, 479 (Bankr. W.D. Pa. 2008) (noting that "a balancing approach is more appropriate than a somewhat mechanical test").  The Third Circuit Court of Appeals has identified the likelihood of success and irreparable harm as the most critical.  See Revel, 802 F.3d at 568 (citations and internal quotations omitted).  The Term Loan Agent can overwhelmingly satisfy these two factors.

## II.     The Term Agent is Entitled to a Stay Pending Appeal.

43.     As set forth more fully below, the Term Loan Agent satisfies the four-prong test necessary for entry of a stay pending its appeal of the Order.  First, the Term Loan Agent is likely to succeed on its appeal because the Order unlawfully allows the disposition of collateral of a secured party by directing its remittance to an unsecured party without the Debtors having satisfied their adequate protection obligations.  Second, absent the Stay, the Term Loan Agent will suffer actual and irreparable harm to the extent the Term Loan Lenders' Collateral will be sold and the proceeds distributed to numerous Consignment Vendors.  Third, there is no evidence to suggest that other parties in interest, primarily the Consignment Vendors, will suffer irreparable harm if the Consignment Sale Price is deposited into the Escrow Account pending

proper resolution of all disputes as to priority of entitlement to the escrowed amounts.  Fourth, granting the Motion will further public policy by upholding the priority scheme codified in the Bankruptcy Code and the Uniform Commercial Code, both of which prioritize properly perfected security interests over improperly perfected security interests and unsecured interests.

**A.  The Bankruptcy Court Committed Reversible Error By Ruling That The Term Loan Agent Is Not Entitled To Adequate Protection.**

44.  In the Third Circuit, "a sufficient degree of success for a strong showing [of success on the merits] exists if there is a reasonable chance, or probability, of winning.  Thus, while it is not enough that the chance of success on the merits be better than negligible, the likelihood of winning on appeal need not be more likely than not."  Revel, 802 F.3d at 568-69 (internal citations and quotations omitted).  At a minimum, the Term Loan Agent has a substantial case that the Bankruptcy Court erred as a matter of law when it entered the Order over the Term Loan Agent's objection to the failure of the Debtors to provide adequate protection.  See Morgan v. Polaroid Corp. (In re Polaroid Corp.), No. Civ. A. 02-12353 JJF, 2004 WL 253477, at *1 (D. Del. Feb. 9, 2004).

45.  First of all, there is no non-frivolous basis to dispute that the Term Loan Agent perfected its security interest in the Prepetition Consigned Goods and their proceeds.

46.  Second, it was Debtors' burden to demonstrate that the Term Loan Agent's interest in collateral was adequately protected if a substantial part of that collateral (the $85 million of disputed cash) was to be disbursed to 160 third parties.

47.  Third, the relief of providing adequate protection is mandatory.  See In re Cont'l Airlines, Inc., 146 B.R. 536, 539 (Bankr. D. Del. 1992) (noting that a debtor's right to use property of the estate in the ordinary course of business is limited by Section 363(e) of the Bankruptcy Code which provides "the court . . . shall prohibit or condition such use . . . as is

15

necessary to provide adequate protection of such interest"), aff'd, 91 F.3d 553 (3d Cir. 1996); see also Resolution Tr. Corp. v. Swedeland Dev. Grp., Inc. (In re Swedeland Dev. Grp., Inc.), 16 F.3d 552, 564 (3d Cir. 1994).  If pursuant to Section 363(e) a creditor with an "interest in property" makes a "request," the court "shall" prohibit or condition the use, sale, or lease of such property on the provision of adequate protection.  11 U.S.C. § 363(e); see also In re Worldcom, Inc., 304 B.R. 611, 618 (Bankr. S.D.N.Y. 2004) (noting that "section 363(e) essentially requires that where a creditor can demonstrate it has a security interest in the property, such creditor is entitled to adequate protection of such interest").

48.     The Bankruptcy Court therefore erred when it entered the Order without requiring compliance with Section 363(e).  Accordingly, the Term Loan Agent satisfies the first prong of the test for whether a stay is appropriate, which the Third Circuit has recognized is "arguably the more important piece of the stay analysis."  Revel, 802 F.3d at 568.

**B.      The Term Loan Agent Will Suffer Irreparable Harm Absent The Stay.**

49.     A party will suffer irreparable harm if it can show "immediate irreparable injury" or a "presently existing actual threat" for which there is no adequate remedy at law.  See Acierno v. New Castle Cty., 40 F.3d 645, 655 (3d Cir. 1994); Deerfield Med. Ctr. v. City of Deerfield Beach, 661 F.2d 328, 338 (5th Cir. 1981).  Typically, an adequate remedy at law will result from a money judgment, which is why courts often find that "[e]conomic loss does not constitute irreparable harm."  Acierno, 40 F.3d at 653.

50.     However, in an appropriate case, a court may "protect a future damages remedy through the issuance of a preliminary injunction" or stay.  Chi. Title Ins. Co. v. Lexington & Concord Search & Abstract, LLC, 513 F. Supp. 2d 304, 319 (E.D. Pa. 2007) (citing Elliott v. Kiesewetter, 98 F.3d 47, 47 (3d Cir. 1996)).  To be entitled to relief, the movant must

demonstrate both its likelihood to become entitled to a future money judgment and that without relief, it will probably be unable to recover.  See id.  In his recent transcript ruling issuing a temporary stay on an emergency basis, Bankruptcy Judge Sontchi recognized that, even where a distribution of funds would go to only five, "large, well-known, hopefully highly solvent banking institutions, the reality is that once you disburse money, the time, expense, etc., associated with getting it back is not easy and is not insignificant."  Del. Tr. Co. v. Wilmington Tr., N.A. (In re Energy Future Holdings, Inc.), Case Nos. 15-51239, 14-10979 (CSS), Mar. 24, 2016 Hr'g Tr. 19:10-15, Decl. Ex. I.

51.    Other courts have similarly found that a movant who shows it will likely be unable to recover does not have an adequate remedy at law and therefore satisfies the standard for proving irreparable harm.  See, e.g., Lynch v. Omaha Nat'l Bank, 666 F.2d 1208, 1212 (8th Cir. 1981) (finding irreparable harm where plaintiff would be forced to pursue numerous transferees in a multiplicity of suits to gain relief absent a stay of distributions from an escrow fund); Cyganowski v. Bioletic U.S. Inc. (In re Biolitec, Inc.), Case No. 13-11157 (DHS), 2015 WL 351201, at *12 (D.N.J. Jan. 23, 2015) (finding that the "multinational nature of the Defendant corporations" made the ability to collect on award of money damages extremely tenuous, meaning there was no adequate remedy at law and therefore plaintiff required injunctive relief to address its irreparable harm).  Here, absent the Stay, the Term Loan Agent has no adequate remedy at law to address the consequences of the Order.

52.    First, the staggering number of Consignment Vendors who are to receive payment by enforcement of the Order – numbering approximately 160 – makes collection impractical. See Lynch, 666 F.2d at 1212 (finding irreparable harm where plaintiff would have to pursue numerous transferees to collect on any future judgment); Energy Future Holdings, Case Nos. 15-

51239, 14-10979, Mar. 24, 2016 Hr'g Tr. 19:10-15 (recognizing the "reality . . . that once you disburse money, the time, expense, etc., associated with getting it back is not easy and is not insignificant" where five institutions would receive distributions from an escrow account).

53.     Second, certain of the Consignment Venders are located in foreign jurisdictions or, upon information and belief, have assets located in foreign jurisdictions.  To the extent the Debtors remit the Consignment Sale Price to those foreign Vendors, but the Term Loan Agent later secures a money judgment clawing back such payments, the Term Loan Agent may have to domesticate judgments abroad and seek enforcement against overseas assets.  See Cyganowski, 2015 WL 351201, at *12 (recognizing that because "the multi-national nature of the Defendant corporations renders the recovery of a money judgment unlikely, such a judgment is not sufficient to redress the harm to the Plaintiffs in this case").  Indeed, the Debtors acknowledge collectability is an issue when requesting first-day relief to pay their so-called "Critical Vendors," some of whom are foreign entities.  See Debtors' Motion for Interim and Final Orders Authorizing Debtors to Pay Certain Prepetition Claims of Critical Vendors, dated Mar. 2, 2016 [D.I. 19] ¶ 12 ("Based on the substantial experience of the Debtors' management in the industry and their knowledge of the foreign vendors, the Debtors believe there is a significant risk that the foreign vendors may consider themselves beyond the jurisdiction of this Court . . .") (emphasis added).  And, of course, other Consignment Vendors may themselves be in financial distress or may be transient entities.

### C.     There Is No Evidence That Granting The Stay Will Harm Any Party.

54.     Granting the Stay will not harm any of the nonmoving parties, including the Consignment Vendors.  The very purpose of a stay pending appeal is to "maintain the status quo."  KOS Pharm., 369 F.3d at 708.  In granting the Stay, the Court will maintain the status quo

18

by allowing the Debtors to once again escrow the Consignment Sale Price while the Term Loan Agent pursues its appeal.  The Consignment Vendors will remain unaffected, because, to the extent the Order is not modified on appeal, proceeds will be disbursed to the Consignment Vendors from the Escrow Account.  See In re St. Johnsbury Trucking Co., 185 B.R. 687, 690-91 (S.D.N.Y. 1995) (finding that a brief delay in distribution of estate property resulting from a stay does not impose an undue burden on creditors).  Accordingly, the harm, if any, that the Consignment Vendors will suffer if the Stay is granted is far outweighed by the harm that the Term Loan Agent will suffer if it is not.

**D.    Public Policy Supports Granting The Stay.**

55.    The most critical public policy consideration when assessing the merits of a stay motion is the correct application of the law, especially where the underlying dispute involves property rights.  See Revel, 802 F.3d at 573 ("[P]ublic policy strongly favors the correct application of the Bankruptcy Code, especially where property rights are at stake.")

56.    Given the significant issues on which the Term Loan Agent is likely to prevail either before the Bankruptcy Court (which has not yet addressed on a substantive basis the relative priority of the interests of the Term Loan Agent and the 160 vendors) or on appeal, and the need to ensure that the Term Loan Agent is not stripped of its property rights by operation of the Order pending that determination, granting the Stay is clearly in the public interest in this case.  See AT&T Co. v. Winback and Conserve Program, Inc., 42 F.3d 1421, 1427 n.8 (3d Cir. 1994) ("As a practical matter, if a plaintiff demonstrates both a likelihood of success on the merits and irreparable injury, it almost always will be the case that the public interest will favor the plaintiff.").

## III.    **The Bond Requirement Should Be Waived**.

57.    Bankruptcy Rule 8007 gives the Court discretion to condition the Stay on the posting of a bond.  The posting of a bond, however, is not a statutory requirement for granting the Stay.  See Nordhoff Invs., Inc. v. Zenith Elecs. Corp., 258 F.3d 180, 191 (3d Cir. 2001) (noting that a stay may be sought "with or without posting a bond").  A bond is unnecessary in the present case because a stay pending appeal will not cause any harm.  "[I]f there is an absence of proof showing a likelihood of harm, certainly no bond is necessary."  Cont'l Oil Co. v. Frontier Refining Co., 338 F.2d 780, 782 (9th Cir. 1964); see also In re United Merchs. & Mfrs., Inc., 138 B.R. 426, 427 (D. Del. 1992) (a bond for a stay is discretionary and unnecessary when the stay does not cause any harm); Fox Sports Net West 2, LLC v. Los Angeles Dodgers LLC (In re Los Angeles Dodgers LLC), 465 B.R. 18, 38 (D. Del. 2011) (same).

58.    Here, there can be no showing of a likely harm to be avoided.  As set forth above, the only issue would be a delayed distribution.  Furthermore, to the extent the Court so orders, the Debtors will be required to deposit all Consignment Sale Proceeds into an interest-bearing Escrow Account pending resolution of the expedited appeal.  Such interest would compensate the Consignment Vendors for any delay in distribution.  Accordingly, the Court should not require the Term Loan Agent to post a bond in connection with the Stay.

*[Remainder of page intentionally left blank]*

**WHEREFORE**, for the foregoing reasons, the Term Loan Agent respectfully requests that the Court (i) enter an Order, substantially in the form attached hereto as Exhibit A; and (ii) grant any other relief that the Court deems just and proper.

Dated: April 8, 2016
      Wilmington, Delaware

**MORRIS, NICHOLS, ARSHT & TUNNELL LLP**

*/s/ Daniel B. Butz*
Robert J. Dehney (No. 3578)
Gregory W. Werkheiser (No. 3553)
Daniel B. Butz (No. 4227)
1201 N. Market St., 16th Floor
P.O. Box 1347
Wilmington, DE  19899-1347
Tel: 302-658-9200
Fax: 302-658-3989
Email: rdehney@mnat.com
       gwerkheiser@mnat.com
       dbutz@mnat.com

-and-

**BROWN RUDNICK LLP**
Robert J. Stark (admitted *pro hac vice*)
William R. Baldiga (admitted *pro hac vice*)
May Orenstein (*pro hac vice* pending)
Bennett S. Silverberg (admitted *pro hac vice*)
Seven Times Square
New York, NY 10036
Tel: (212) 209-4800
Fax: (212) 209-4801

*Counsel to Wilmington Savings*
*Fund Society, FSB, as Term Loan Agent*

## EXHIBIT A

**(PROPOSED ORDER)**

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 11 |
| SPORTS AUTHORITY HOLDINGS, INC., *et al.*,[1] | Case No. 16-10527 (MFW) |
| Debtors. | (Jointly Administered) |
| WILMINGTON SAVINGS FUND SOCIETY, FSB, AS SUCCESSOR ADMINISTRATIVE AND COLLATERAL AGENT, | |
| Appellant, | C.A. No. _____ |
| v. | |
| SPORTS AUTHORITY HOLDINGS, INC., *et al.*, | |
| Appellees. | |

**ORDER GRANTING EMERGENCY MOTION BY WILMINGTON SAVINGS
FUND SOCIETY, FSB, AS TERM LOAN AGENT FOR A STAY PENDING APPEAL
OF ORDER RESOLVING DEBTORS' ABILITY TO SELL CONSIGNED GOODS**

Upon consideration of the emergency motion (the "Motion") of Wilmington Savings

Fund Society, FSB, as successor administrative and collateral agent (the "Term Loan Agent")

under that certain Amended and Restated Credit Agreement, dated as of November 16, 2010, by

and among The Sports Authority, Inc., as the Borrower, Slap Shot Holdings Corp., as Holdings,

Wilmington Savings Fund Society, FSB, as successor Administrative Agent and Collateral

Agent to Bank of America, N.A, and the lenders from time to time party thereto; and upon the

emergency motion (the "Stay Motion") pursuant to Rule 8007 of the Federal Rules of

Bankruptcy Procedure, for a stay (the "Stay") pending appeal (the "Appeal") of the *Supplemental*

---

[1]     The Debtors and the last four digits of their respective taxpayer identification numbers are as follows: Sports Authority Holdings, Inc. (9008); Slap Shot Holdings, Corp. (8209); The Sports Authority, Inc. (2802); TSA Stores, Inc. (1120); TSA Gift Card, Inc. (1918); TSA Ponce, Inc. (4817); and TSA Caribe, Inc. (5664).   The headquarters for the above-captioned Debtors is located at 1050 West Hampden Avenue, Englewood, Colorado 80110.

*Interim Order Authorizing the Debtors to Continue to Sell Certain Prepetition Consigned Goods*, dated April 6, 2016 [D.I. 1044]; and this Court having reviewed and considered the Stay Motion; and after due deliberation thereon and good cause appearing therefor;

**IT IS** on this _____ day of _____, 2016

**ORDERED** that enforcement of the Order shall be stayed as set forth herein pending final disposition of the Appeal.

**ORDERED** that the Debtors are authorized to sell the Prepetition Consigned Goods[2] in the ordinary course of business and in going-out-of-business sales.

**ORDERED** that the Debtors shall not comply with the payment terms set forth in the applicable Consignment Agreements, as set forth in Paragraph 3 of the Order.

**ORDERED** that, in lieu of such compliance, the Debtors shall deposit all Disputed Amounts from the post-petition sale of Prepetition Consigned Goods into a separate escrow account at Wells Fargo Bank, N.A. pending final disposition of the Appeal.

**ORDERED** that notwithstanding any rule to the contrary, this Order shall take effect immediately upon entry.

**ORDERED** that the Court shall retain jurisdiction to resolve any disputes arising under or related to this Order and to interpret, implement, and enforce the provisions of this Order.

**ORDERED** that a true copy of this Order shall be served on all interested parties within seven (7) days hereof.

_____
UNITED STATES DISTRICT JUDGE

---

[2]     Capitalized terms not otherwise defined herein shall have the meanings ascribed to them in the Stay Motion.

**EXHIBIT B**

**(OTHER PARTIES TO THE APPEAL)**

| | |
|---|---|
| **YOUNG CONAWAY STARGATT & TAYLOR, LLP**<br>Michael R. Nestor (No. 3526)<br>Kenneth J. Enos (No. 4544)<br>Andrew L. Magaziner (No. 5426)<br>Rodney Square<br>1000 North King Street<br>Wilmington, Delaware 19801<br>Telephone: (302) 571-6600<br>Facsimile: (302) 571-1253<br>Email: mnestor@ycst.com<br>        kenos@ycst.com<br>        amagaziner@ycst.com<br><br>-and-<br><br>**GIBSON, DUNN & CRUTCHER LLP**<br>Robert A. Klyman (CA No. 142723)<br>Matthew J. Williams (NY No. 3019106)<br>Jeremy L. Graves (CO No. 45522)<br>Sabina Jacobs (CA No. 274829)<br>333 South Grand Avenue<br>Los Angeles, CA 90071-1512<br>Telephone: (213) 229-7000<br>Facsimile: (213) 229-7520<br><br>Email: rklyman@gibsondunn.com<br>        mjwilliams@gibsondunn.com<br>        jgraves@gibsondunn.com<br>        sjacobs@gibsondunn.com<br><br>*Counsel to the Debtors and Debtors in Possession* | **ASHBY & GEDDES, P.A.**<br>Gregory A. Taylor, Esq. (#4008)<br>Benjamin W. Keenan, Esq. (#4724)<br>500 Delaware Avenue, 8th Floor<br>P.O. Box 1150<br>Wilmington, Delaware 19899-1150<br>Tel: (302) 654-1888<br>Fax: (302) 654-2067<br>Email: gtaylor@ashby-geddes.com<br>Email: bkeenan@ashby-geddes.com<br><br>-and-<br><br>**RIEMER & BRAUNSTEIN LLP**<br>Donald E. Rothman, Esq.<br>Paul S. Samson, Esq.<br>Marjorie S. Crider, Esq.<br>Three Center Plaza, Suite 600<br>Boston, Massachusetts 02108<br>Tel: (617) 523-9000<br>Fax: (617) 880-3456<br>Email: DRothman@riemerlaw.com<br>Email: PSamson@riemerlaw.com<br>Email: MCrider@riemerlaw.com<br><br>*Counsel for Bank of America, N.A., as administrative agent and collateral agent* |

| | |
|---|---|
| **THE ROSNER LAW GROUP LLC**<br>Frederick B. Rosner, Esq. (DE 3995)<br>Julia B. Klein, Esq. (DE 5198)<br>824 N. Market Street, Suite 810<br>Wilmington, DE 19801<br>(302) 777-1111<br>E-mail: rosner@teamrosner.com<br>        klein@teamrosner.com<br><br>**-and-**<br><br>**AKERMAN LLP**<br>Richard B. Brosnick, Esq.<br>666 Fifth Avenue<br>20th Floor<br>New York, NY 10103<br>(212) 880-3834<br>E-mail: richard.brosnick@akerman.com<br><br>*Counsel to Casio* | **GELLERT SCALI BUSENKELL**<br>**& BROWN, LLC**<br>Ronald S. Gellert (DE 4259)<br>Margaret F. England (DE 4248)<br>1201 North Orange Street, Suite 300<br>Wilmington, Delaware 19801<br>Tel.:  (302) 425-5800<br>Fax:  (302) 425-5814<br>E-mail:  mengland@gsbblaw.com<br><br>**-and-**<br><br>**SULMEYER KUPETZ, A PROFESSIONAL**<br>**CORPORATION**<br>David S. Kupetz (Pro Hac Vice)<br>Jessica L. Vogel (Pro Hac Vice)<br>333 South Hope Street, 35th Floor<br>Los Angeles, CA 90071<br>Tel.:  (213) 636-2311<br>Fax:  (213) 629-4520<br><br>*Counsel for Agron, Inc.* |
| **CHIPMAN BROWN CICERO**<br>**& COLE, LLP**<br>William E. Chipman, Jr.<br>Mark D. Olivere<br>Hercules Plaza<br>1313 North Market Street, Suite 5400<br>Wilmington, Delaware 19801<br>Tel.:  (302) 295-0191<br>Fax:  (302) 295-0199<br>E-mail:  chipman@chipmanbrown.com<br>        olivere@chipmanbrown.com<br><br>*Counsel for Gordini USA, Inc. and SGS*<br>*Sports, Inc., SP Images, Inc., and Sport*<br>*Write, Inc.* | **SULLIVAN · HAZELTINE · ALLINSON LLC**<br>William A. Hazeltine (No. 3294)<br>901 North Market Street, Suite 1300<br>Wilmington, DE 19801<br>Tel: (302) 428-8191<br>Fax: (302) 428-8195<br><br>**-and-**<br><br>**REINHART BOERNER VAN DEUREN S.C.**<br>Michael D. Jankowski, Esq.<br>L. Katie Mason, Esq.<br>1000 North Water St., Suite 1700<br>Milwaukee, WI 53202<br><br>*Attorneys for Wigwam Mills, Inc.* |

2

**MINTZ, LEVIN, COHN, FERRIS, GLOVSKY AND POPEO, P.C.**
Adrienne K. Walker (pro hac vice)
Eric R. Blythe (pro hac vice)
One Financial Center
Boston, Massachusetts 02111
Tel: 617-542-6000
Fax: 617-542-2241
E-mail: awalker@mintz.com
          eblythe@mintz.com

Jeffry A. Davis (pro hac vice)
3580 Carmel Mountain Road, Suite 300
San Diego, CA 92130
Tel: 858-314-1500
Fax: 858-314-1501
E-mail: jdavis@mintz.com

**-and-**

**LOIZIDES, P.A**
Christopher S. Loizides (No. 3968)
1225 King Street, Suite 800
Wilmington, DE 19801
Tel: 302-654-0248
E-mail: loizides@loizides.com

*Counsel to ASICS America Corporation*

**BARNES & THORNBURG LLP**
David M. Powlen (DE Bar No. 4978)
Kevin G. Collins (DE Bar No. 5149)
1000 N. West Street, Suite 1500
Wilmington, DE 19801
Telephone: (302) 300-3434
Facsimile: (302) 300-3456
Email: david.powlen@btlaw.com
          kevin.collins@btlaw.com

**-and-**

**LINDQUIST & VENNUM LLP**
George H. Singer (pro hac vice)
Adam C. Ballinger (pro hac vice)
4200 IDS Center
80 South 8th Street
Minneapolis, MN 55402
Telephone: (612) 371-3211
Facsimile: (612) 371-3207
Email: gsinger@lindquist.com
          aballinger@lindquist.com

*Counsel to Shock Doctor, Inc.*
*d/b/a United Sports Brands*

**McELROY, DEUTSCH, MULVANEY & CARPENTER, LLP**
David P. Primack, Esq. (No. 4449)
300 Delaware Avenue, Suite 770
Wilmington, DE 19801
Telephone: 302-300-4515
Facsimile: 302-645-4031
E-mail: dprimack@mdmc-law.com

*Counsel to Altus Brands, LLC*

**BUCHANAN INGERSOLL & ROONEY PC**
Mary F. Caloway (No. 3059)
919 N. Market Street, Suite 1500
Wilmington, Delaware 19801
Tel: 302-552-4200
Fax: 302-552-4295
E-mail: mary.caloway@bipc.com

*Counsel to Implus Footcare, LLC*

3

| | |
|---|---|
| **CHIPMAN BROWN CICERO & COLE, LLP**<br>William E. Chipman, Jr.<br>Mark D. Olivere<br>Hercules Plaza<br>1313 North Market Street, Suite 5400<br>Wilmington, Delaware 19801<br>Tel.: (302) 295-0191<br>Fax: (302) 295-0199<br>E-mail: chipman@chipmanbrown.com<br>olivere@chipmanbrown.com<br><br>**-and-**<br><br>**WOLFSON BOLTON PLLC**<br>Anthony J. Kochis (MI P72020)<br>3150 Livernois, Suite 275<br>Troy, Michigan 48083<br>Tel: (248) 247-7105<br>E-mail: akochis@wolfsonbolton.com<br><br>*Counsel for Ameriform Acquisition*<br>*Company, LLC d/b/a KL Industries* | **THE ROSNER LAW GROUP LLC**<br>Frederick B. Rosner, Esq. (DE 3995)<br>Julia B. Klein, Esq. (DE 5198)<br>824 N. Market Street, Suite 810<br>Wilmington, DE 19801<br>(302) 777-1111<br>Email: rosner@teamrosner.com<br>klein@teamrosner.com<br><br>**-and-**<br><br>**DAVIDOFF HUTCHER**<br>**& CITRON LLP**<br>David H. Wander, Esq.<br>605 Third Avenue<br>New York, NY 10158<br>Email: dhw@dhclegal.com<br><br>*Counsel to Castlewood* |
| **FERRY JOSEPH, P.A.**<br>Jason C. Powell, Esq. (No. 3768)<br>824 Market Street, Suite 1000<br>P.O. Box 1351<br>Wilmington, DE 19899<br>Telephone: (302) 575-1555<br>Facsimile: (302) 575-1714<br>Email: jpowell@ferryjoseph.com<br><br>**-and-**<br><br>**Harris Beach PLLC**<br>Wendy A. Kinsella, Esq.<br>Lee E. Woodard, Esq.<br>333 West Washington St.<br>Suite 200<br>Syracuse, NY 13202<br>(315) 423-7100<br>(315) 422-9331 (fax)<br>Email: wkinsella@harrisbeach.com<br>lwoodard@harrisbeach.com<br><br>*Counsel for E&B Giftware LLC* | **COZEN O'CONNOR**<br>Mark E. Felger (Bar No. 3919)<br>Keith L. Kleinman (Bar No. 5693)<br>1201 North Market Street<br>Suite 1001<br>Wilmington, DE 19801<br>Tel: (302) 295-2000<br>Fax: (888) 207-2440<br><br>**-and-**<br><br>**NIXON PEABODY LLP**<br>Victor G. Milione<br>Christopher J. Fong<br>437 Madison Avenue<br>New York, NY 10022<br>Telephone: (212) 940-3000<br>Facsimile: (212) 940-3111<br><br>*Co-Counsel to Easton Baseball / Softball*<br>*Inc., Bauer Hockey, Inc., Performance*<br>*Lacrosse Group Inc., and BPS Diamond*<br>*Sports Inc.* |

| | |
|---|---|
| **CAMPBELL & LEVINE, LLC**<br>Ayesha C. Bennett (Bar No. 4994)<br>222 Delaware Avenue, Suite 1620<br>Wilmington, DE 19801<br>Phone: (302) 426-1900<br>Fax: (302) 426-9947<br>Email: abennett@camlev.com<br><br>**-and-**<br><br>**HORWOOD MARCUS & BERK CHARTERED**<br>Jason M. Torf<br>500 West Madison, Suite 3700<br>Chicago, IL 60661<br>Phone: (312) 606-3236<br>Fax: (312) 267-2202<br>Email: jtorf@hmblaw.com<br><br>*Counsel to O2Cool, LLC* | **CROSS & SIMON, LLC**<br>Joseph Grey (No. 2358)<br>913 North Market Street, 11th Floor<br>P.O. Box 1380<br>Wilmington, Delware 19899<br>302-777-4200<br>E-mail: jgrey@crosslaw.com<br><br>**-and-**<br><br>**COMAN & ANDERSON, P.C.**<br>David A. Newby<br>650 Warrenville Rd.<br>Ste. 500<br>Lisle, IL 60532<br>630-428-2660<br>E-mail: DNewby@comananderson.com<br><br>*Counsel to Boyt Harness Company, LLC* |
| **SEITZ, VAN OGTROP & GREEN, P.A.**<br>222 Delaware Ave., Suite 1500<br>P.O. Box 68<br>Wilmington, Delaware 19899<br>Tel: 302-888-0600<br>E-mail: khill@svglaw.com<br><br>**-and-**<br><br>**LESNICK PRINCE & PAPPAS LLP**<br>185 Pier Avenue, Suite 103<br>Santa Monica, CA 90405<br>Tel: 310-396-0964<br>Fax: 310-396-0963<br>E-mail: matt@lesnickprince.com<br><br>*Counsel to Bravo Sports* | **LOWENSTEIN SANDLER LLP**<br>Michael S. Etkin, Esq.<br>65 Livingston Avenue<br>Roseland, New Jersey 07068<br>973.597.2500 (Telephone)<br>973.597.2400 (Facsimile)<br><br>David M. Banker, Esq.<br>1251 Avenue of the Americas<br>New York, New York 10020<br>212-262-6700 (Telephone)<br>212-262-7402 (Facsimile)<br><br>*Counsel to Goal Zero LLC* |

| | |
|---|---|
| **BLAKELEY LLP**<br>Peter M. Sweeney (DE # 3671)<br>1000 N. West Street, Suite 1200<br>Wilmington, Delaware 19801<br>Telephone: (302) 415-9908<br>Email: psweeney@blakeleyllp.com<br><br>*Attorneys for the Ad Hoc Committee of*<br>*Consignment Creditors* | **COBLENTZ, PATCH, DUFFY**<br>**& BASS LLP**<br>Gregg M. Ficks (pro hac vice pending)<br>One Montgomery Street, Suite 3000<br>San Francisco, California 94104<br>Telephone: 415.391.4800<br>Facsimile: 415.989-1663<br>E-mail: gficks@coblentzlaw.com<br><br>*Counsel for J.J's Mae, Inc. d/b/a Rainbeau*<br>*(Local Counsel to be retained in accordance*<br>*with Local Rule 9010-1(d))* |
| **THE ROSNER LAW GROUP LLC**<br>Frederick B. Rosner (DE 3995)<br>Julia B. Klein (DE 5198)<br>824 N. Market Street, Suite 810<br>Wilmington, DE 19801<br>Telephone: (302) 777-1111<br>E-mail: rosner@teamrosner.com<br>          klein@teamrosner.com<br><br>**-and-**<br><br>**DRUMMOND WOODSUM**<br>Jeremy R. Fischer<br>84 Marginal Way, Suite 600<br>Portland, ME 04102<br>Telephone: (207) 772-1941<br>E-mail: jfischer@dwmlaw.com<br><br>*Counsel to Filmar USA, Inc.* | **GELLERT SCALI BUSENKELL**<br>**& BROWN, LLC**<br>Ronald S. Gellert (DE 4259)<br>Margaret F. England (DE 4248)<br>1201 North Orange Street, Suite 300<br>Wilmington, Delaware 19801<br>Tel.:  (302) 425-5800<br>Fax:   (302) 425-5814<br>E-mail:  mengland@gsbblaw.com<br><br>**-and-**<br><br>**Law Offices of Edwin J. Rambuski**<br>Edwin J. Rambuski<br>1401 Higuera Street<br>San Luis Obispo, CA 9340<br>Tel.: (805) 546-8284<br>Fax.: (805) 546-8489<br><br>*Counsel for Performance Apparel Corp.* |
| **BARNES & THORNBURG LLP**<br>David M. Powlen (DE Bar No. 4978)<br>Kevin G. Collins (DE Bar No. 5149)<br>1000 N. West Street, Suite 1500<br>Wilmington, DE 19801<br>Telephone: (302) 300-3434<br>Facsimile: (302) 300-3456<br>Email: david.powlen@btlaw.com<br>          kevin.collins@btlaw.com<br><br>*Counsel to Trends International, LLC* | **BORGES & ASSOCIATES, LLC**<br>Wanda Borges, Esq. (wb4904)<br>575 Underhill Blvd., Suite 118<br>Syosset, New York 11791<br>Tel: (516) 677-8200 x225<br>Fax: (516) 677-0806<br>E-mail: wborges@borgeslawllc.com<br><br>*Attorneys for Hi-Tec Sports USA, Inc.* |

| | |
|---|---|
| **GELLERT SCALI BUSENKELL & BROWN LLC**<br>Ronald S. Gellert (DE 4259)<br>Margaret F. England (DE 4248)<br>1201 North Orange Street, Suite 300<br>Wilmington, Delaware 19801<br>Telephone: (302) 425-5800<br>Facsimile: (302) 425-5814<br>Email: mengland@gsbblaw.com<br><br>**-and-**<br><br>**LATHROP & GAGE LLP**<br>Stephen K. Dexter<br>950 Seventeenth Street, Suite 2400<br>Denver, Colorado 80202<br>Telephone: (720) 931-3200<br>Facsimile: (720) 931-3201<br>Email: sdexter@lathropgage.com<br><br>*Counsel for Midland Radio Corporation* | **GELLERT SCALI BUSENKELL & BROWN LLC**<br>Ronald S. Gellert (DE 4259)<br>Margaret F. England (DE 4248)<br>1201 North Orange Street, Suite 300<br>Wilmington, Delaware 19801<br>Telephone: (302) 425-5800<br>Facsimile: (302) 425-5814<br>Email: mengland@gsbblaw.com<br><br>**-and-**<br><br>**SNELL & WILMER LLP**<br>David E. Leta (*pro hac vice* pending)<br>15 West South Temple, Suite 1200<br>Salt Lake City, Utah 84101<br>Telephone: (801) 257-1900<br>Facsimile: (801) 257-1800<br>Email: delta@swlaw.com<br><br>*Counsel for Ogio International, Inc.* |
| **STEVENS & LEE, P.C.**<br>Joseph H. Huston, Jr. (No. 4035)<br>919 North Market Street, 7th Floor<br>Wilmington, DE 19801<br>Telephone: (302) 425-3310<br><br>**-and-**<br><br>**BERNSTEIN, SHUR, SAWYER & NELSON**<br>Robert J. Keach, Esq. (pro hac vice)<br>Michael A. Siedband (pro hac vice)<br>100 Middle Street, West Tower<br>P.O. Box 9729<br>Portland, Maine 04104-5029<br>(207) 774-1200<br><br>*Counsel for Mission Product Holdings, Inc.* | |